UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Juan Ortiz,

    Plaintiff,

v.                                        Case No.: 13-13192

Grand Trunk Western Railroad          Honorable Sean F. Cox
Company,

    Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. #14)

This is an employment case. Plaintiff Juan Ortiz ("Plaintiff") alleges that his former employer, Grand Trunk Western Railroad Company ("Defendant" or "GTW"), terminated his employment because he filed an injury report, in violation of the Federal Railroad Safety Act ("FRSA").[1] Defendant maintains that Plaintiff was terminated for willful, blatant misconduct and rule violations.

The matter is currently before the Court on Defendant's Motion for Summary Judgment. (Doc. #14). The motion has been fully briefed by the parties and the Court heard oral arguments on August 28, 2014. For the reasons set forth below, the Court shall GRANT Defendant's Motion for Summary Judgment.

## BACKGROUND

**1)    Factual Background**

Plaintiff was hired by Defendant in or around August 1992 as a trackman, and thereafter held

---

[1] 49 U.S.C. § 20101 *et seq.*

other positions as a Machine Operator, Assistant Foreman, and Foreman. (Def.'s Stmt. at 7; Pl.'s Stmt. at 7).

During the summer of 2010, Plaintiff was working as a Machine Operator on a production crew operating a rail lifter machine. (Def.'s Stmt. at 15; Pl.'s Stmt. at 15). On July 20, 2010, the first day Plaintiff operated the rail lifter, he noted that the machine had an exhaust leak, and he reported his finding to a mechanic, Mark Kline ("Kline"). (Def.'s Stmt. at 16; Pl.'s Ctr. Stmt. at 16). Plaintiff further contends that he also notified his supervisor, Walter Krejci ("Krejci"), of the exhaust leak (Pl.'s Dep. at 72-73).

The rail lifter machine had a logbook in which users of the machine were to note the daily condition of the machine and report any mechanical or technical issues they observe. (Def.'s Stmt. at 18; Pl.'s Stmt. at 18). According to the logbook, Plaintiff continued to run the machine on at least a dozen occasions between July 21 and August 16, 2010. (Def.'s Stmt. at 19; Pl.'s Ctr. Stmt. at 19). On several occasions, Plaintiff noted in the logbook that the exhaust leak was causing him physical discomfort.[2] (Def.'s Stmt. at 20; Pl.'s Ctr. Stmt. at 20).

On August 16, 2010, Plaintiff informed Krejci that no repairs had been made to the exhaust. (Def.'s Stmt. at 25; Pl.'s Stmt. at 25). Krejci told Plaintiff that he would go get a mechanic. (Def.'s Stmt. at 26; Pl.'s Ctr. Stmt. at 26). Plaintiff testified in pertinent part:

Q. And then August 16th, 2010 you worked with the rail lifter again, right?

A. Yes.

Q. Did you write in oil level okay, muffler not fixed yet, break tests 5 feet, rail dry?

---

[2] Plaintiff maintains he was under the impression that both Supervisors and Mechanics look at the logbook from time to time. (Pl.'s Dep. at 76-77).

> A. That's correct.
>
> Q. And on that day did you write that at the beginning of the day?
>
> A. Yes, ma'am.
>
> Q. Okay. Did you talk to anyone - - before you had the accident and passed out did you talk to anyone about the rail lifter that day?
>
> A. I talked to Krejci.
>
> Q. What did you say to Krejci?
>
> A. I told him that it was ridiculous that after so many weeks the stupid muffler was still not fixed.
>
> Q. What did he say?
>
> A. He said he was going to go and get a mechanic.
>
> Q. So did you wait for him to go get a mechanic?
>
> A. No, he wanted me to keep working.
>
> Q. Did he tell you that?
>
> A. Yes.
>
> Q. Did you tell him no?
>
> A. No, I didn't say no, I continued to work.

(Pl. Dep. at 108-109). Shortly after Plaintiff returned to working with the rail lifter machine, he fainted. (Pl. Dep. at 123-124). An ambulance was quickly called and Senior Production Manager David Chaney ("Chaney") was notified of the incident. (Def.'s Stmt. at 29; Pl.'s Stmt. at 29). After he was revived, Plaintiff indicated his desire to return to work. (Pl. Dep. at 124-25). However, Chaney had instructed Production Supervisor Martin Bowers ("Bowers") by cell phone that Plaintiff

3

must go to the hospital for medical evaluation. (Def.'s Stmt. at 31; Pl.'s Stmt. at 31).

Prior to leaving the work yard, Chaney briefly spoke to Plaintiff by phone. Plaintiff described the contents of the brief conversation:

> Q. Tell me about the conversation with Dave [Chaney].
>
> A. Well, I said hello and he said hello again. He says I heard that you just fainted out there, and I said yes. He said are you going to - there's only one question for you, are you going to claim this as an injury, so I told him, well, what do you think?
>
> Q. Okay. And what did he say?
>
> A. Nothing. I gave the phone back to Marty [Bowers].

(Pltf. Dep. at 128-29). Following this conversation, Plaintiff was taken to the hospital. (*Id.*). After being treated and released, Bowers drove Plaintiff back to the rail yard where Plaintiff completed an injury report. (Def.'s Stmt. at 39; Pl.'s Stmt. at 39).

On August 17, 2010, Chaney began a preliminary site investigation to try to determine the circumstances leading up to Plaintiff's injury. (Def.'s Stmt. at 40; Pl.'s Stmt. at 40). Chaney reviewed the log books for the rail lifter machine and spoke with Krejci, Bowers, Kline, and Leslie Floyd ("Floyd") about the incident. (Def.'s Stmt. at 42; Pl.'s Stmt. at 42). Chaney concluded that Plaintiff did not report any issue with the rail lifter exhaust other than on July 29, 2010, August 12, 2010 at the end of the day, and at the beginning of Plaintiff's shift on August 16. (Chaney Dep. at 37).

Based on his preliminary investigation, Chaney concluded that Plaintiff may have violated GTW safety rules for failing to notify management of issues with the equipment. (Chaney Dep. at

4

37-38, 62-64). Moreover, Chaney concluded that Plaintiff should have refused to run the rail lifter if the exhaust was leaking or making him ill.[3] (Chaney Dep. at 37-38).

On August 23, 2010, GTW issued a notice of formal investigation to determine whether Plaintiff or Kline had committed any rule violations with respect to the rail lifter incident. (Def.'s Stmt. at 53; Pl.'s Stmt. at 53). However, the investigation was postponed for nearly sixteen months due in part to Kline's illness and Plaintiff's extended medical leave of absence. The formal investigation hearing was ultimately held on January 20, 2012. (Def.'s Stmt. at 54; Pl.'s Stmt. at 54).

At the conclusion of the formal investigation hearing, Company Official Lawrence Wizauer ("Wizauer") concluded that Plaintiff had committed the following rule violations in regards to the August 2010 rail lifter machine incident:

- USOR General Rule A - Safety

- USOR General Rule C - Alert and Attentive

- USOR General Rule K - Equipment Inspection

- OTS Appendix C: Roadway Maintenance Machines

- LIFE US Safety Rules - Section II: Core Safety Rules, Section II: Vehicles

(Def.'s Stmt. at 57; Pl.'s Stmt. at 57). Wizauer also found that Kline had violated several safety rules by failing to fully inspect the machine to determine its safety. (Def.'s Stmt. at 58; Pl.'s Stmt. at 58).

On February 8, 2012, Plaintiff was suspended from service for 30 working days for his

---

[3] Contrary to Chaney's assertions that Plaintiff failed to properly report any issues with the rail lifter, Plaintiff maintains he notified his colleagues of the problems he encountered just about every day. (Pl. Dep. p. 105, 107).

5

August 2010 rule violations. He was also suspended for 15 actual working days from service, to be deferred for 24 months. (Def.'s Stmt. at 61; Pl.'s Stmt. at 61). Kline, who had not reported an injury, was also disciplined. (Def.'s Stmt. at 62; Pl.'s Stmt. at 62).

Following Plaintiff's return to work from his suspension in March 2012, he committed a series of GTW rule violations. On May 14, 2012, Plaintiff backed a company truck into a utility pole while Track Laborer Jose Perez ("Perez") was with him in the vehicle. (Def.'s Stmt. at 66; Pl.'s Stmt. at 66). Plaintiff admits that he is aware of a company rule requiring a driver to let his passenger out of the vehicle to assist in backing up. (Pl. Dep. at p. 175). Moreover, Plaintiff admits that Perez had asked him two times to let him out of the vehicle to assist in backing up. (*Id.*). Nevertheless, Plaintiff refused to let Perez out of the vehicle because Plaintiff believed he "could see just fine." (*Id.*).

After Plaintiff backed the truck into the utility pole, Supervisor Jim Gasiecki ("Gasiecki") responded to the incident. (Def.'s Stmt. at 71; Pl.'s Stmt. at 71). When the Plaintiff was transferring his tools from the damaged truck to a new rental truck, he was asked to produce a Vehicle Inspection logbook. (*Id.*). From his testimony, it appears that Plaintiff was under the impression that Gasiecki was asking for the inspection book for the rental truck. (Pl. Dep. at 195). However, according to Plaintiff, rental trucks do not usually have log books and that is why Plaintiff was unable to produce one.[4] (Pl. Dep. at 193).

On May 15, 2012, Supervisor Floyd reported that Plaintiff was performing his job duties

---

[4] Gasiecki testified that after he asked Ortiz for the vehicle's inspection book, Plaintiff told him that it was at his home. Accordingly, Gasiecki instructed Plaintiff to bring the book to work the next day. (Gasiecki Dep. at 17-19). Gasiecki further testified that when he followed up with Plaintiff the next day, Plaintiff did not produce the book as instructed. (Gasiecki Dep. at 24-25).

without wearing a reflective vest. (Def.'s Stmt. at 71; Pl.'s Stmt. at 71). Plaintiff admits that he briefly removed his reflective vest in order to remove his jacket because he was too hot. (Pl. Dep. at p. 200). However, Plaintiff maintains that he immediately put his vest back on. (*Id.*).

On June 6, 2012, an investigative hearing was held to determine: 1) whether Plaintiff had violated any safety rules in connection with the company vehicle incident on May 14, 2012; 2) whether Plaintiff had refused to follow a direct order from a supervisor to produce the vehicle logbook; and 3) whether Plaintiff violated GTW rules by failing to wear a reflective vest on May 15, 2012. (Def.'s Stmt. at 79; Pl.'s Stmt. at 79).

Prior to the scheduled hearing, Plaintiff submitted a document to GTW Medical Services stating that Plaintiff was under a doctor's care, and his union representative wrote to GTW requesting a postponement of the hearing. (Def.'s Stmt. at 81; Pl.'s Stmt. at 81). The request was denied and Plaintiff was not present at the June 6 hearing.[5] (Def.'s Stmt. at 80; Pl.'s Stmt. at 80).

Following the hearing, Wizauer concluded that Plaintiff's refusal to allow Perez to get out of the vehicle constituted a violation of the following company rules:

- USOR - General Rule B - Reporting and Complying with Instructions
- LIFE Safety Rules - Safety Job Briefings - Field #B
- LIFE Safety Rules - Section II: Core Safety Rules - Work Environment #13

(Def.'s Stmt. at 97; Pl.'s Stmt. at 97). Chaney further noted that Plaintiff's refusal to allow Perez to get out and guide the truck in backing up reflected "a blatant disregard for company rules and

---

[5] Plaintiff admits that none of his doctors had restricted him from attending the June 6, 2012 hearing. (Def.'s Stmt. at ¶ 91; Pl.'s Stmt. at ¶ 91). Plaintiff admits, "I was the one that decided that because I wasn't physically or mentally 100 percent." (Pl. Dep. at p. 183-185).

procedures, a blatant disregard for safety." (Chaney Dep. at p. 82).

With respect to the logbook incident, Wizauer and Chaney determined that Plaintiff was insubordinate and had violated USOR - General Rule B - Reporting and Complying with Instructions. (Def.'s Stmt. at 106; Pl.'s Stmt. at 106). As Plaintiff did not attend the hearing, he did not offer a response to these charges against him. (Def.'s Stmt. at 102; Pl.'s Stmt. at 102).

Plaintiff was not disciplined for his failure to wear a reflective vest as it was not determined to be a willful rule violation. (Def.'s Stmt. at 112; Pl.'s Stmt. at 112). However, on June 21, 2012, Defendant terminated Plaintiff's employment for failure to produce the logbook and for multiple rule violations in conjunction with the truck accident. (Letter from Chaney to Plaintiff Dated June 21, 2012, Pl. Ex. R).

**2)	Procedural History**

On August 3, 2012, Plaintiff filed a complaint with the Occupational Health and Safety Administration ("OHSA") claiming that Defendant violated section 20109 of the FRSA when Defendant terminated his employment. Plaintiff also alleged that Defendant interfered with his ability to obtain medical treatment for his work-related injury.[6] (Compl. at ¶ 19).

Section 20109 of the FRSA provides that a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an

---

[6] Plaintiff admits in his Response brief that the medical treatment claim is time-barred and, thus, agrees to withdraw it. (Pl. Resp. at 2)

employee." 49 U.S.C. § 20109(a)(4).

Section 20109 subpart c provides that

> if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for *de novo* review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury.

49 U.S.C. § 20109(d)(3). OHSA did not issue a final decision within 210 days after Plaintiff filed his administrative complaint. Accordingly, on June 18, 2013, OHSA dismissed Plaintiff's administrative complaint and Plaintiff filed the present complaint with this Court.

Section 20109(e) of the FRSA allows for recovery of all damages required to make a plaintiff whole. This includes "reinstatement with the same seniority status that the employee would have had, but for the discrimination, any backpay, with interest, and compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees." 49 U.S.C. § 20109(e). Moreover, punitive damages may be awarded; however, the amount awarded may not exceed $250,000. (*Id.*). Except for lost wages, Plaintiff requests all remedies available to him pursuant to 49 U.S.C. § 20109(e), as well as punitive damages.[7] (Compl., Doc. # 1 at 24; Pl.'s Resp., Doc. # 24 at 2).

Following the close of discovery, Defendant filed a Motion for Summary Judgment as to Plaintiff's remaining retaliatory discharge claim. (Doc. # 14). Plaintiff has filed a response (Doc.

---

[7] On July 6, 2011, Plaintiff filed a lawsuit in the Wayne County Circuit Court against GTW under the Federal Employer's Liability Act seeking damages for past and future lost wages. The lawsuit reached a confidential settlement in January 2013. (Def.'s Stmt. at ¶ 119; Pl.'s Stmt. at ¶ 119).

9

#24), and Defendant has replied. (Doc. #26).

## STANDARD OF DECISION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984) (quoting FED. R. CIV. P. 56(C)). "The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). Moreover, the court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ANALYSIS

The Federal Railroad Safety Act ("FRSA") is designed "to promote safety in every area of railroad operations." 49 U.S.C. § 20101. Congress amended the FRSA in 2007, thus "expanding the scope of the anti-retaliation protections and providing enforcement authority with the Department of Labor." *Araujo v. New Jersey Transit Rail Operations, Inc.,* 708 F.3d 152, 156 (3d Cir. 2013). According to the court in *Araujo*, the 2007 FRSA amendments were established "due to a history of whistleblower harassment and retaliation in the industry." *Id.* at 159.

"Under the newly amended FRSA, a railroad carrier 'may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in

whole or in part' to the employee's engagement in one of numerous protected activities." *Id.* (quoting 49 U.S.C. § 20109(a)). A railroad worker's report of a workplace injury or illness constitutes one of the enumerated protected activities. 49 U.S.C. § 20109(a)(4).

Plaintiff alleges that Defendant violated the FRSA because his 2010 injury report was a contributing factor in Defendant's decision to terminate his employment. Defendant contends that Plaintiff cannot show that his termination was in any way related to his 2010 injury report, and that even if Plaintiff had never filed his 2010 injury report, Defendant would have terminated Plaintiff's employment due to his willful safety rule violations.

The FRSA specifically incorporates the burden-shifting approach applicable to whistleblower claims arising under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"). 49 U.S.C. §42121(b)(2)(B)(i)-(ii). To prevail on a FRSA whistleblower claim, an employee must show that "1) he engaged in protected activity; 2) the employer knew that he engaged in protected activity; 3) he suffered an unfavorable personnel action; and 4) the protected activity was a contributing factor in the unfavorable personnel action." *Conrail v. United States DOL*, 2014 WL 2198410 at *2 (6th Cir. May 28, 2014) (quoting *Araujo*, 708 F.3d at 157). Essentially, "[t]he employee bears the initial burden, and must show 'by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint.'" *Id.* (quoting 29 C.F.R. § 1982.109(a)). If Plaintiff establishes a *prima facie* case of whistleblower retaliation, the burden will then shift to the employer to demonstrate "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.*

Here, the first three elements of the *prima facie* case are uncontroverted. Accordingly, the

11

only issue for this Court to determine is whether Plaintiff has come forth with evidence that his injury report was a contributing factor in Defendant's decision to terminate his employment.

To establish a *prima facie* case of FRSA retaliation, Plaintiff must come forth with evidence that his 2010 injury report was a contributing factor in Defendant's decision to terminate his employment. "The contributing factor standard has been understood to mean 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Conrail*, 2014 WL 2198410 at *3 (quoting *Araujo*, 708 F.3d at 158). In other words, "[t]he plaintiff-employee need only show that his protected activity was a contributing factor in the retaliatory discharge or discrimination, not the sole or even predominant cause." *Araujo*, 708 F.3d at 158.

An FRSA plaintiff can prove that their protected activity contributed to the adverse employment event through direct or circumstantial evidence. Circumstantial evidence that a protected activity was a contributing factor in an adverse employment decision may include evidence of: temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity. *Ray v. Union Pac. RR. Co.*, 971 F. Supp. 2d 869, 885 (S.D. Iowa 2013).

In its motion, Defendant contends that Plaintiff's intervening misconduct severs any possible causal connection between Plaintiff's protected activity and his subsequent employment termination. (Def. Mo., Doc. #14, at 21-22).

In response, Plaintiff contends that circumstantial evidence supports his conclusion that his

August 2010 injury report was a "contributing factor" to his termination. (Pl.'s Resp. Br. at 9-16). Plaintiff contends that there is: 1) "temporal proximity" between Plaintiff's protected activity and Defendant's adverse employment decision and, 2) evidence of "disparate treatment" of Plaintiff.

### 1) Is There Temporal Proximity Between Plaintiff's Protected Activity And Defendant's Adverse Employment Decision?

Plaintiff contends there is temporal proximity between his August 2010 injury report and Defendant's termination of his employment, which occurred on June 21, 2012. "Temporal proximity between the employee's engagement in a protected activity and the unfavorable personnel action can be circumstantial evidence that the protected activity was a contributing factor to the adverse employment action." *Araujo*, 708 F.3d at 158.

When Plaintiff returned to work in January 2012 after a lengthy medical leave, Defendant held a formal investigative hearing regarding Plaintiff's August 2010 incident. Plaintiff does not dispute that he was suspended from work for 30 days due to his violation of company rules regarding the rail lifter incident. (Def. Stmt. at ¶¶ 51-63). Plaintiff returned to work in March of 2012 following his disciplinary suspension, and was assessed three additional rule violations by May of 2012. After another investigative hearing, at which Plaintiff was noticeably absent, Defendant terminated Plaintiff's employment.

Defendant maintains that there can be no such finding of temporal proximity. Defendant distinguishes *Araujo*, the case on which Plaintiff relies, because there the adverse employment action took place just a few days after the protected activity. Here, Defendant notes that Plaintiff was terminated nearly sixteen months after his initial injury report. (Def.'s Reply, Doc. #26, at 2). Additionally, Defendant argues that Plaintiff's intervening rule violations sever any relationship between the injury report and Plaintiff's termination.

The Court finds Defendant's argument more persuasive. First, the adverse employment action at issue here is Defendant's termination of Plaintiff's employment in June 2012. Plaintiff does not challenge his January 2012 discipline as retaliatory. In another case dealing with retaliatory discharge under the FRSA, the court found that "a plaintiff cannot establish a *prima facie* case of retaliation based on temporal proximity alone when the termination occurred two months after the alleged protected conduct." *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) (citing *Kipp v. Mo. Hwy & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). "Such a lengthy gap in time weighs against a finding that it is more likely than not that the alleged protected activit[y] played a role in his termination." *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 349 (4th Cir. 2014) (finding that in the context of an action alleging a whistleblower claim under the Sarbanes-Oxley Act, a 20-month gap is too long to establish temporal proximity.)

Here, the August 2010 injury report and Plaintiff's June 2012 discharge are nearly two years apart. Other courts considering FRSA claims have held that events separated by as little as two months are not temporally proximate. Therefore, the Court finds that temporal proximity does not support the conclusion that Plaintiff's injury report contributed to his termination, where nearly two years separate the protected activity and the adverse employment decision.

**2)    Has Plaintiff Come Forth With Evidence Of Disparate Treatment?**

Relying on *Araujo*, Plaintiff argues that circumstantial evidence of disparate treatment supports his position because 1) other individuals were not disciplined for committing the same rule violations that resulted in Plaintiff's January 2012 discipline, and 2) other individuals were not disciplined for committing the same rule violations that resulted in Plaintiff's June 2012 termination.

First, another individual *was* disciplined for committing rule violations regarding the August

14

2010 rail lifter incident. Mechanic Kline was not injured and did not file an injury report, yet was disciplined for failure to properly inspect the rail lifter and remove it from service in July and August of 2010. (Def.'s Reply Br. at 4; Def.'s Stmt. at 62; Pl.'s Stmt. at 62).

Moreover, Plaintiff is not similarly situated to Bowers, Krecji or Floyd because those individuals are supervisors and managers who assisted Chaney in investigating the rail lifter incident. (Pl. Stmt. at p. 24-25). Bowers, Krecji and Floyd also served as witnesses at the formal investigation hearing. (Chaney Dep., Ex. 5). Defendant did not conclude that Bowers, Krecji or Floyd had engaged in rule violations because Wizauer did not find Plaintiff's testimony wholly credible. (Chaney Dep., Ex. 5). Therefore, Plaintiff cannot show that he suffered disparate treatment in regards to the rule violations he received in conjunction with the August 2010 incident.

Nor does Plaintiff have any evidence supporting his claim of disparate treatment based on his May 2012 rule violations. Defendant claims that it dismissed Plaintiff from service because 1) he admitted to backing into a utility pole with a company vehicle, 2) he refused to allow his passenger, Jose Perez, out of the vehicle to guide him in backing up, as required by Defendant's rules, 3) he failed to produce a vehicle logbook immediately after the accident, and failed to produce it the following day as promised to his supervisor. (Rule Violation Letters to Plaintiff, attached to Def. Mo. at Ex. 11).

Plaintiff relies on the deposition testimony of James Gasiecki, Grand Trunk Western Manager of Public Works, to establish that no one has ever been fired for getting into an accident involving a company vehicle, for not letting out a passenger out of the vehicle to assist in navigation, or for failing to produce a logbook. (Gasiecki Dep., Pl. Ex. O, at pp. 22-25, 33-35).

But Gasiecki's testimony is more equivocal than Plaintiff represents. Gasiecki did opine that

15

"a vehicle accident doesn't get a person fired . . ." (Gasiecki Dep. at 34), but testified earlier that he didn't know if anybody has been fired for being involved in a vehicle accident. (Gasiecki Dep., Pl. Ex. O, at 22). When asked whether he had "been involved in any investigation where an employee was fired because he didn't have his passenger get out to guide him when he was backing up a vehicle," Gasiecki responded "not that I know of." (Gasiecki Dep., Ex. O at 21). At best, Gasiecki's testimony establishes that he does not know whether someone has ever been fired for such misconduct. Gasiecki's testimony does not establish that Plaintiff was actually treated differently than other individuals.

Importantly, Defendant maintains that it terminated Plaintiff for committing all of these safety rule violations in a short period of time. Even if Plaintiff could show that one of these infractions would be insufficient to warrant dismissal, he has not identified a former GTW employee who committed all of the same rule infractions and was not terminated. Quite simply, Plaintiff has no evidence that he is similarly situated to any other individual for purposes of showing disparate treatment regarding his June 2012 termination. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (in the context of a racial discrimination action the court held that "to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

Based on the foregoing, the Court finds that Plaintiff has not come forth evidence sufficient to create an genuine issue of material fact as to whether that his injury report was a contributing factor to his termination. Therefore, as Plaintiff has failed to establish an essential element of his

*prima facie* case, the Court shall GRANT Defendant's Motion for Summary Judgment.[8]

## CONCLUSION

Based on the foregoing, the Court shall GRANT Defendant's Motion for Summary Judgment (Doc. #14) and DISMISS WITH PREJUDICE Plaintiff's Complaint.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 17, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 17, 2014, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

---

[8] Because the Court finds Plaintiff has failed to establish a *prima facie* case, the Court shall decline to determine whether Defendant has proved by clear and convincing evidence that it would have terminated Plaintiff's employment regardless of his protected activity.